**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| TSI TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 23-1011-KHV |
| | ) | |
| CFS BRANDS, LLC and DINEX, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

On December 16, 2022, in the District Court of Sedgwick County, Kansas, plaintiff filed suit against CFS Brands, LLC and Dinex. On January 26, 2023, defendants removed the case to federal court based on diversity jurisdiction. See Notice Of Removal (Doc. #1).

This matter comes before the Court on Defendants' Motion For Summary Judgment And Memorandum In Support (Doc. #74) and Defendants' Motion To Exclude The Expert Opinions And Testimony Of Brian Clothier (Doc. #73), both filed June 7, 2024, and defendants' Request For Hearing (Doc. #83) filed July 30, 2024. For reasons stated below, the Court overrules defendants' motion for summary judgment in its entirety. It also overrules defendants' motion to exclude Clothier's expert testimony and overrules as moot defendants' request for a hearing on the motion to exclude.

**Summary Judgment Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735,

740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.

**Factual Background**

The Court first addresses deficiencies in the parties' briefing, which violates District of Kansas Local Rules 7.1(d)(2) and 56.1.  First, defendants' principal brief and plaintiff's response exceed the 40-page limits set forth in Local Rule 7.1(d)(2).  In addition, defendants' reply brief

exceeds the 15-page limit set forth in the same rule.  Neither party sought or received permission to depart from the Local Rules.

Second, defendants fail to comply with Local Rule 56.1, which requires parties moving for summary judgment to begin their supporting brief with a section that contains a concise statement of material facts as to which they contend no genuine issue exists.  Defendants begin their brief with an opening statement which argues their view of the case.  On page nine of their brief, defendants finally begin their statement of uncontroverted facts.  Because neither party has objected to these rule violations, the Court accepts the filings in this instance but states the obvious: the Court does not look favorably upon violations of the Local Rules.

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

## I.      The License Agreement And Addendum

Plaintiff, TSI Technologies, LLC, is a Kansas corporation that develops induction heating technologies and thermal energy storage materials for use in the food service industry.  Plaintiff has patented some of this technology for use in various products, including induction heatable servers.  An induction heatable server utilizes an induction heater and charger to automatically heat a meal server to a desired temperature on every use, allowing a plate to stay warm for over an hour.  Dinex (now a division of CFS Brands) manufactures, markets and sells food service equipment.

On October 5, 2001, plaintiff and Dinex entered into a "Food Service Base License Agreement" ("the License Agreement").  Under the License Agreement, plaintiff—with input

from Dinex—agreed to design a Food Service Base ("the Base").[1]   Plaintiff granted Dinex a license to manufacture, use, market and sell the Base, incorporating certain heat retentive technology that plaintiff had developed and patented.

A.   TSI Base Patents

In the License Agreement, plaintiff licensed six patents (collectively, the "TSI Base Patents") to Dinex for use in manufacturing, marketing and selling the Base:[2]

(1)   U.S. Patent No. 5,954,984 ("the 984 Patent"), issued September 21, 1999;

(2)   U.S. Patent No. 6,232,585 ("the 585 Patent"), issued May 15, 2001;

(3)   U.S. Patent No. 6,274,856 ("the 856 Patent"), issued August 14, 2001;

(4)   U.S. Patent No. 6,320,169 ("the 169 Patent"), issued November 20, 2001;[3]

(5)   U.S. Patent Pending No. 09/775,037; and

(6)   U.S. Patent Pending No. 09/826,792

Without requiring additional compensation, the license extended to any improvements that plaintiff made on the TSI Base Patents, as well as any new inventions for use in connection with

---

[1]   The License Agreement defines "Food Service Base" as "a one-piece device shaped to receive a standard personal serving plate. The Food Service Base comprises a plastic dish with an integral core composed of inductively susceptible materials and phase change materials. The Food Service Base is designed so that its integral core is heated when placed upon an induction heater so as to store thermal energy." Food Service Base License Agreement (Doc. #17-1) filed February 23, 2023 at 1.

[2]   Plaintiff also granted Dinex a license to technology for which two international patent applications were pending. The international patents are not relevant to the claims at issue here.

[3]   Although the License Agreement lists U.S. Patent Pending No. 09/655,942, the parties have stipulated that on November 20, 2001, the U.S. Patent and Trademark Office ("USPTO") issued the 169 Patent based on that application. See Pretrial Order (Doc. #72) filed May 6, 2024 at 3.

the Base.

The License Agreement allowed either party to file for a patent "on the application of the technology represented by the [TSI Base Patents] solely to the Food Service Base."  License Agreement (Doc. #17-1), ¶ 6.  The License Agreement referred to such a patent as the "Food Service Base Patent."  Id.  The parties agreed that if either party filed for a Food Service Base Patent on the "application of the technology represented by the [TSI Base Patents]," then "[b]oth parties shall be joint owners of such Food Service Base Patent."  Id.

B.      Royalty Payments

Under the License Agreement, Dinex agreed to pay plaintiff royalty payments on Dinex's net sales of the Base.  The License Agreement defined "net sales" as "the total of all charges invoiced to customers for the Food Service Base reduced by such deduction as declared in writing by [Dinex]."  Id., ¶ 4(d).  Dinex also agreed to provide a calculation of the royalty amount and obtain from its independent accounting firm an annual certification of the accuracy of the payments.  In addition, Dinex agreed to retain for three years all records relating to royalty payments and calculations and to allow plaintiff to review the records upon request.

C.      The Addendum

Under the License Agreement, plaintiff did not license any patents to Dinex to manufacture, market or sell "Food Service Base Induction Chargers" ("the Chargers") for the Bases.  In December of 2007, plaintiff and Dinex began negotiating an Addendum to the License Agreement to address Dinex's desire to manufacture and sell the Charger along with the Base.  On January 23, 2008, the parties entered into an Addendum which granted Dinex a license to

manufacture and sell a Charger and a Base as a system.[4]  Under the Addendum, plaintiff licensed

three specific patents (collectively, "the TSI Charger Patents") to Dinex: the 585 Patent, the 169

Patent and U.S. Patent No. 6,657,170 ("the 170 Patent").[5]  The Addendum stated that only plaintiff

had the right to file for a patent on the application of technology represented by any claim on the

TSI Charger Patents.

       The Addendum required Dinex to pay royalties to plaintiff on net sales of the Chargers,

which included technology covered by the TSI Charger Patents.  Dinex agreed to pay "[a] royalty

of 4.09 percent of the amount of the Net Sales Price of each [Charger] sold by [Dinex]."

Addendum (Doc. #17-4), ¶ 2(a).  The Addendum defined "Net Sales Price" as "the invoiced sales

price at which [Dinex] or its Affiliates sells to unaffiliated third parties, which price is not reduced

by any rebates, allowances, commissions or subsequent discounts."  Id. at 1.  As with the License

Agreement, the Addendum specifically required Dinex to accompany its royalty payments to

plaintiff with its calculation of the amount and retain all records of its calculations so that plaintiff

could review them upon request.

       Dinex's obligation to make royalty payments on net sales of the Base terminated once the

claims of any TSI Base Patent or Food Service Base Patent no longer covered technology included

in the Base.  Similarly, Dinex's obligation to make royalty payments on net sales of the Chargers

---

[4]       The Addendum defines "Food Service Base Induction Chargers" as "the magnetic
induction electronics employing Radio Frequency Identification (RFID) technology which but for
the license set forth in Paragraph 1 of this Addendum would infringe a valid claim of U.S.
Patent 6,232,585 and/or U.S. Patent 6,320,169, or any present or future patents owned by
[plaintiff], that is intended for use in conjunction with the Food Service Base."  Addendum To
Food Service Base License Agreement (Doc. #17-4) at 1.

[5]       The Addendum lists U.S. Patent No. 6,657,150 as a licensed TSI Charger Patent
but the parties agree that this is a typographical error and that the Addendum should refer instead
to U.S. Patent No. 6,657,170 (the 170 Patent).

terminated once the claims of the TSI Charger Patents no longer covered the Charger.

## II.     The 882 Patent

Beginning in 2006, Dinex began to redesign the Base to resolve various mechanical issues with the product, including a water infiltration problem.

On December 18, 2007, William Hensley, an employee of plaintiff, sent Rick Runyan, an employee of Dinex, a memorandum stating that while on a site visit at another entity, plaintiff's employees saw a "patent pending" mark on the latest Dinex Base.  Hensley asserted that while the License Agreement permitted Dinex to file a patent application on the Base, plaintiff would jointly own any such patent.

On December 20, 2007, Runyan responded to Hensley's memorandum, asserting that plaintiff did not jointly own the new Base patent because the patent application covered a new plastic molding process that a Dinex vendor, Seitz Corporation, had developed independently. Describing the new Base design, Runyan stated that with "the injection molding changes made at great expense to Dinex to better secure the 'heat retentive' material, we feel we can finally market a product that will sell and enable us to think in world wide terms."  Email From Runyan To Hensley (Doc. #74-20) at 1.  Runyan offered to provide plaintiff a finalized copy of the patent application.

Weeks later, plaintiff had not received a copy of the patent application and Hensley reached out to Runyan and informed him that plaintiff was "content to wait and defer addressing this issue until after we have something to evaluate.  In the meantime, we'll reserve our right to address this issue until after we get the promised information."  Email From Hensley To Runyan (Doc. #74-4) at 1.  Plaintiff never again requested the patent application, and Dinex did not produce it.

On January 30, 2008, Dinex and Seitz filed Patent Application No. 12/010,768, entitled

"Induction Heated Server and Method of Making."   <u>United States Patent Application No. 12/010,768</u> (Doc. #7-1) filed February 2, 2023 at 4.   The application listed Brian C. Jones, Glenn H. Goyette, Albert J. Beland and Richard C. Runyan as the inventors.   On May 13, 2010, Dinex and Seitz filed a continuation of that application in part.   On January 22, 2013, the USPTO issued U.S. Patent No. 8,357,882 (the "882 Patent") based on that continuation.   During this time, although the documents were publicly available, plaintiff took no steps to locate the patent applications or the 882 Patent.

The 882 Patent includes ten total claims: nine dependent claims (claims 2–10) and one independent claim (claim 1).[6]   The independent claim states that the induction heatable server is comprised of four elements:

> (a)  a synthetic resin top element having a depending peripheral flange;
>
> (b)  a synthetic resin bottom element having a bottom wall and a peripheral wall with an upper portion extending over a peripheral portion of said top element and together defining a cavity;
>
> (c)  a heat retentive disc in said cavity, said bottom element being overmolded with synthetic resin about said heat retentive disc and having a generally horizontal flange extending over said peripheral portion of said top element to encapsulate said heat retentive disc and to firmly bond the top and bottom elements into a monolithic structure which precludes moisture penetration into said cavity; and
>
> (d)  a ring member extending about the periphery of said heat retentive disc, said ring member being overmolded and bonded to a peripheral portion of said bottom

---

[6]        By way of context, patent applications (and issued patents) include claims, which are the "metes and bounds" of the invention and define the scope of the patent owner's rights. <u>Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.</u>, 868 F.2d 1251, 1257 (Fed. Cir. 1989).  "A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but never the function or result of either, nor the scientific explanation of their operation." <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 373 (1996) (citation and internal quotation marks omitted).  "By definition, an independent claim is broader than a dependent claim, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well."  <u>Littelfuse, Inc. v. Mersen USA EP Corp.</u>, 29 F.4th 1376, 2380 (Fed. Cir. 2022).

element.

882 Patent (Doc. #7-1) at 43.  Claim 5 is a dependent claim which adds one additional element to the independent claim: a radio frequency identification ("RFID") tag located in a well in the lower surface of the bottom wall.[7]

### III.    Royalty Payments To Plaintiff

As modified by the Addendum, the License Agreement set forth how Dinex royalty payments to plaintiff would be calculated.  When defendants made royalty payments to plaintiff, they calculated the amount by "taking the total dollar amount of its invoiced sales of the [Bases and Chargers] for a quarter, deducting the dollar amount of returns of the [Bases and Chargers] which were the subject of refunds to a customer for that quarter, and then paid royalties at 4.09% on the net amount of invoice[d] sales of the [Bases and Chargers] for that quarter."  Declaration Of Jay Froehlich In Support Of Defendants' Motion For Summary Judgment (Doc. #74-10), ¶ 2. Defendants owed plaintiff royalties on all invoiced sales, which were considered final for purposes of royalties owed.  If a customer returned a product and defendants re-sold it, the License Agreement required defendants to pay the 4.09 per cent royalty fee for that sale.

Defendants' obligation to pay royalties to plaintiff terminated once the TSI Base Patents or the TSI Charger Patents no longer covered the Base and the Charger.  The patents expired on the following dates: the 585 Patent on May 19, 2019; the 169 Patent on September 6, 2020; and the 170 Patent on May 31, 2022.  CFS Brands paid royalties to plaintiff on invoiced sales of the Chargers until April 8, 2022.  Between September 6, 2020 (when the 169 Patent expired) and April 8, 2022, CFS Brands made eight payments to plaintiff, totaling $149,228.38.  Defendants

---

[7]    The other dependent claims (2–4 and 6–10) are not relevant to the disposition of defendants' motion for summary judgment.

believed that they had made payments after the relevant patents expired and asked plaintiff to refund them $149,228.38.  Plaintiff refused.

As of December of 2022—when plaintiff filed this suit—CFS Brands did not employ any individuals who had participated in the negotiations for the License Agreement or the Addendum.

### Procedural Background

On December 16, 2022, in the District Court of Sedgwick County, plaintiff filed suit against defendants.  On January 26, 2023, defendants removed the case to federal court based on diversity jurisdiction.  See Notice Of Removal (Doc. #1).

On February 23, 2023, plaintiff amended its complaint, asserting claims for breach of contract (Count I), misrepresentation and fraud by silence (Count II) and an accounting (Count III).  See Revised Amended Complaint (Doc. #17).  On September 27, 2023, the Court sustained in part Defendants' Motion To Dismiss Plaintiff's Revised Amended Complaint For Failure To State A Claim And Memorandum In Support (Doc. #22) filed March 8, 2023.  In that order, the Court dismissed Count II of plaintiff's amended complaint, which asserted misrepresentation and fraud by silence.  See Memorandum And Order (Doc. #42).

Plaintiff's remaining claims include (1) breach of contract, (2) breach of the covenant of good faith and fair dealing and (3) declaratory relief for an accounting.  Pretrial Order (Doc. #72) at 13.  Specifically, plaintiff alleges that the 882 Patent is an application of the technology contained in its active licensed patents and defendants breached the License Agreement when they (1) ceased royalty payments in April of 2022; (2) calculated their royalty payments; (3) failed to declare deductions in writing; and (4) failed to provide certification from an independent

accounting firm on the accuracy of their royalty payments.[8] Id. at 8–9.  In addition, plaintiff alleges that defendants breached the covenant of good faith and fair dealing by failing to pay royalties owed, and it is entitled to an accounting to determine the amount defendants have underpaid in royalties.  Id.

Defendants assert counterclaims for conversion (Count I), money had and received (Count II) and unjust enrichment (Count III).  Id. at 14.  Defendants allege that (1) the 882 Patent is not an application of the technology contained in the TSI Base Patents so they do not owe royalties on the 882 Patent; (2) the License Agreement does not prohibit them from reducing royalty payments based on customer returns; (3) they overpaid royalties to plaintiff because the last TSI Charger Patent (the 169 Patent) expired in September of 2020, and they continued to pay royalties until May of 2022, when the 170 Patent expired; and (4) plaintiff wrongfully refuses to return the overpayments.  Id.

On June 7, 2024, defendants filed a motion for summary judgment on plaintiff's claims and their counterclaims.  See Motion For Summary Judgment (Doc. #74).

## Analysis

The Court again addresses defendants' compliance with the District of Kansas Local Rules. See Local Rule 5.4.2(c).  In support of their motion for summary judgment, defendants filed 11 provisionally sealed exhibits.  See Defendants' Motion For Summary Judgment (Doc. #74); see also Defendants' Provisionally Sealed Exhibits (Doc. #75) filed June 10, 2024.  Under Local Rule 5.4.2(c), a party seeking to maintain a document under seal must file a motion to seal or redact within seven days of the document being filed provisionally under seal.  Defendants did not

---

[8]     Because the Addendum modifies the License Agreement, the Court refers to all alleged breaches as breaches of the License Agreement.

file a motion to seal or redact.  Because federal courts have long recognized a common-law right of access to judicial records, see Mann v. Boatright, 477 F.3d 1140, 1149 (10th Cir. 2007), the Court directs the Clerk to unseal the provisionally sealed documents attached to defendants' motion.  In combination with the parties' non-compliance in the form of their briefings, the Court again admonishes defense counsel to scrutinize the local rules before filing further documents with this Court.

Defendants seek summary judgment on plaintiff's breach of contract and accounting claims, asserting that (1) the statute of limitations bars plaintiff's claim for breach of contract because any breach occurred in 2008; (2) in December of 2007, plaintiff learned that Dinex intended to file a patent application, yet took no action at that time to assert that the intended patent would cover an "application of the technology" contained in the TSI Base Patents, so plaintiff has waived its right to seek royalties based on this argument; (3) the 882 Patent is not an "application of the technology" contained in the TSI Base Patents and even if it was, defendants independently developed the Base and thus owe no further royalties on sales of the Base; and (4) the License Agreement permits deductions for returns from the invoiced sales price, so defendants did not underpay royalties and plaintiff is not entitled to an accounting. In addition, defendants seek summary judgment on their three counterclaims.  Defendants argue that as a matter of law, plaintiff wrongfully possesses funds which belong to them.

For reasons set forth below, viewing the evidence in the light most favorable to plaintiff, the Court finds that the record reveals genuine issues of material fact whether defendants breached the License Agreement.   Accordingly, the Court overrules defendants' motion for summary

judgment on plaintiff's breach of contract claim.[9]  Because the Court construes plaintiff's request for an accounting as a method to determine damages, defendants are not entitled to judgment as a matter of law and the Court overrules their motion for summary judgment on this issue.  Finally, because defendants have not established as a matter of law that plaintiff possesses funds belonging to them, the Court overrules defendants' motion for summary judgment on their counterclaims.

## I.      Plaintiff's Claims

### A.      Breach Of Contract

To establish a claim for breach of contract under Kansas law, plaintiff must show (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) plaintiff's willingness to perform in compliance with the contract; (4) defendants' breach of the contract; and (5) damages to plaintiff caused by the breach.  Commercial Credit Corp. v. Harris, 212 Kan. 310, 313, 510 P.2d 1322, 1325 (1973).

#### 1.   Whether The Statute Of Limitations Bars Plaintiff's Claim For Breach Of Contract

Defendants seek summary judgment on plaintiff's claim for breach of contract, arguing

---

[9]      The Pretrial Order (Doc. #72) at 13 sets forth plaintiff's theories of recovery: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing and (3) declaratory relief for an accounting.

Under Kansas law, the duty of good faith and fair dealing is implied in all Kansas contracts. Waste Connections of Kan., Inc. v. Ritchie Corp., 296 Kan. 943, 965, 298 P.3d 250, 265 (2013). Kansas law does not authorize a separate cause of action, however, for breach of the duty of good faith and fair dealing; it is merely a legal argument related to a breach of contract claim.  Shelby Dev., LLC v. Shawnee Cnty., 2023 WL 4831201, 532 P.3d 1240, at *9 (Kan. Ct. App. 2023). Generally, the question whether the duty has been violated raises a question of fact.  Waste Connections, 296 Kan. at 965, 298 P.3d at 265.  Accordingly, to the extent that defendants seek summary judgment on this implied duty, the Court overrules defendants' motion because an issue of fact exists whether defendants abided by their duty of good faith under the License Agreement. For purposes of defendants' motion, the Court only addresses plaintiff's overarching breach of contract claim.

that the five-year statute of limitations, set forth in K.S.A. § 60–511(1), bars that claim.    This

reasoning is a classic example of a straw man argument, i.e. a logical fallacy that involves refuting

a position which is different from the one being asserted, and it is without merit.

Under Kansas law, the statute of limitations for breach of contract claims begins to run

when defendants allegedly breach the contract.  Graphic Tech., Inc. v. Pitney Bowes Inc., 968 F.

Supp. 602, 606 (D. Kan. 1997).   A cause of action accrues when the right to institute and maintain

a suit arises, or when a demand is capable of present enforcement.  Holder v. Kan. Steel Built, Inc.,

224 Kan. 406, 410, 582 P.2d 244, 248 (1978).

Defendants assert that the License Agreement requires assignment of ownership, and that

any breach of contract claim accrued instantly on January 30, 2008, when Dinex filed its patent

application without having assigned ownership or notifying plaintiff of the application.[10]

Defendants argue that plaintiff had until January 30, 2013—five years after Dinex filed the patent

application—to bring a claim for breach of contract.  Plaintiff argues that the License Agreement

does not require either party to assign an ownership interest or notify the other if it files a Food

Service Base Patent.  Plaintiff claims that defendants did not breach the contract until May of 2022,

when they refused to pay the required royalties for the 882 Patent and plaintiff first incurred

damages.  Accordingly, plaintiff argues that it filed suit well within the statute of limitations set

forth in K.S.A. § 60–511(1).

To determine whether a breach occurred on January 30, 2008, when defendants filed their

---

[10]    Defendants do not explain why failing to notify plaintiff of the application would
trigger an action for breach of contract.  Furthermore, they do not explain how applying for a
patent—without a pre-existing assignment—would breach the License Agreement.  Without an
actual, issued patent, plaintiff would suffer no damages due to lack of an assignment, so it is not
clear how plaintiff could maintain a breach of contract claim before the patent issued.

patent application for the new Base, the Court reviews Paragraph 6 of the License Agreement, which governs ownership of any Food Service Base Patent.

a.       Interpretation Of Paragraph 6

Although state law governs the interpretation of contracts generally, the question whether a contract provision automatically assigns ownership rights in a patent is governed by federal law because the issue is "intimately bound up with the question of standing in patent cases." DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008).  Owners of a patent are those individuals or entities listed as an inventor on the patent, or those who have been assigned a patent owner's interest.  Banks v. Unisys Corp., 228 F.3d 1357, 1359 (Fed. Cir. 2000) (individual owns patent rights to subject matter of which he is an inventor); 35 U.S.C. § 261 (allowing assignment of patents).

Whether an agreement automatically assigns ownership rights to a patent, or whether the agreement is a promise to assign ownership rights to a patent, depends on the language of the contract itself.  Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364 (Fed. Cir. 2010). "If the contract expressly conveys rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law."  Id.; see SiRF Tech., Inc. v. Int'l Trade Comm'n, 601 F.3d 1319, 1326 (Fed. Cir. 2010) (party automatically obtained legal title to patent when contract stated "the Employee assigns all of his or her right, interest, or title in any invention to the Employer").  By contrast, if the contract states that the party "agrees to assign" or contains similar language, the owner of the patent must take subsequent action for legal title to the patent to vest in another.  Abraxis Bioscience, 625 F.3d at 1364.

In cases where the contract states that a patent "shall be the property of," without additional present-tense verbs of execution, courts interpret the phrase as a statement of intention that the

patent owner must take further action to assign ownership in their patent. Omni MedSci, Inc. v. Apple Inc., 7 F.4th 1148, 1154 (Fed. Cir. 2021). The United States Court of Appeals for the Federal Circuit has held that as a matter of law, the phrase "shall be the property of" is a statement of a future intention to assign the patent at issue and does not automatically vest title in another. Id. at 1157.

Here, Paragraph 6 of the License Agreement states, in relevant part, as follows:

> 6.     Patents on the Food Service Base. Either party may file for a patent on the application of the technology represented by the Patents solely to the Food Service Base ("Food Service Base Patent"). *Both parties shall be joint owners* of such Food Service Base Patent and shall owe no royalty to the other in addition to those designated in this Agreement.

License Agreement (Doc. #17-1), ¶ 6 (emphasis added).

Defendants assert that as a matter of law, the License Agreement required that the party who filed the patent application affirmatively assign an ownership interest in the patent to the other; only then would plaintiff obtain joint ownership and the right to receive royalty payments. In response, plaintiff asserts that federal patent law did not require defendants to take action to assign an ownership interest in a Food Service Base Patent because ownership was automatic under Paragraph 6.

The language in Paragraph 6 ("shall be joint owners") is a statement of intention and required Dinex, the filing party, to take affirmative action to vest legal title in plaintiff. Like the phrase "shall be the property of," the License Agreement's phrase "shall be joint owners," lacks any present-tense active verbs. "The absence of an active verbal expression of present execution is a substantive indication that a present automatic assignment was not intended." Omni MedSci, 7 F.4th at 1156. Accordingly, no breach could occur before January 22, 2013, when Dinex failed to assign to plaintiff an ownership interest in the Food Service Base Patent which issued on that

date.  The License Agreement is silent, however, as to when performance of this obligation was due.  See License Agreement (Doc. #17-1), ¶ 6.  Federal law does not impose a "deadline" for when patent assignment must occur.  Under general contract principles, "if the contract is silent as to time of performance, the law implies performance shall occur within a reasonable time."  Arnold v. S.J.L. of Kan. Corp., 249 Kan. 746, 750, 822 P.2d 64, 68 (1991).  Whether performance of a contract occurs within a reasonable time is usually a question of fact to be determined by the jury.  Int'l Power Mach., Inc. v. Midwest Energy, Inc., 4 F. Supp. 2d 1272, 1276 (D. Kan. 1998).  Neither party has presented evidence or cited legal authority on what is a reasonable amount of time for assignment to take place.  Defendants assume (without authority) that a reasonable time is no time—that assignment must occur before or at the precise nano-second that a patent application is filed.  The Court rejects this reasoning.  On this record, it cannot conclude when any breach based on failure to assign an ownership interest would have occurred.  This issue is ultimately moot, however, because defendants have invented this breach of contract claim; plaintiff has a right to define its own claims and they do not include this one.

In the Pretrial Order (Doc. #72) at 8–9, the operative pleading at this stage, plaintiff alleges that defendants breached the License Agreement when they failed to (1) complete royalty payments for sales of the Base, despite the fact that the 882 Patent had not yet expired and the Base is covered by the claims of the 882 Patent; (2) provide a statement from their independent accounting firm certifying the accuracy of the royalty payments; (3) properly declare deductions in writing; and (4) properly calculate deductions on invoiced sales prices of the Bases.[11]

---

[11]     As noted, plaintiff does not allege that defendants breached the License Agreement by failing to assign an ownership interest in the Food Service Base Patent.  Defendants point to plaintiff's original Complaint (Doc. #1-1) filed in the District Court of Sedgwick County, Kansas.

(continued. . .)

b.      Plaintiff's Breach Of Contract Allegations

Defendants contend that if they breached the License Agreement, it occurred on or before January 30, 2008 when Dinex filed its patent application without notifying plaintiff or taking action to assign ownership of the patent rights to it. Defendants cite absolutely no legal authority for this argument and it is too clever by half. Plaintiff responds that January 30, 2008 does not represent the date on which defendants breached the License Agreement because assignment of ownership was automatic under the License Agreement and thus defendants could not have breached then. Rather, plaintiff asserts that defendants breached the License Agreement later, by refusing to make the required royalty payments.

As stated, under Kansas law, the statute of limitations for plaintiff's breach of contract claim begins to run at the time defendants allegedly breached the contract. Graphic Tech, 968 F. Supp. at 606. To determine whether plaintiff's breach of contract claim falls within the limitations period, the Court looks at the allegations set forth in the Pretrial Order (Doc. #72).

Plaintiff's assertions of breach focus on the royalty payment obligations under the License Agreement. First, plaintiff alleges that defendants breached the License Agreement when they ceased royalty payments for sales of the Base. The parties do not dispute that defendants completed royalty payments until the spring of 2022. Plaintiff filed this suit in December of 2022.

---

[11] (. . .continued)
In that pleading, plaintiff's second count for breach of contract states, "The License Agreement requires that TSI be assigned an ownership interest in the New Patent. Defendants have failed to assign an ownership interest in the New Patent to TSI." Id., ¶ 45. Even so, the pretrial order is "the controlling document for trial" and is "deemed to amend any previous pleadings" in the case. Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002). Therefore, because plaintiff did not assert this allegation of breach (failure to assign ownership interest) in the Pretrial Order (Doc. #72) and thus has waived that claim, the Court does not consider this allegation of breach for purposes of the statute of limitations.

Accordingly, the Court overrules defendants' argument that plaintiff did not timely file this breach of contract claim within the five-year limitation period.

Second, plaintiff alleges that defendants breached the License Agreement when they failed to provide annual certification statements on the accuracy of the royalty payments. Neither party has provided evidence of the dates on which defendants failed to provide certification statements. Defendants assert that plaintiff last requested certification statements in 2011. As discussed later, however, the License Agreement does not require plaintiff to request certification statements. See infra Section I.A.5.a. Defendants' assertion therefore is immaterial. Accordingly, defendants have failed to show that as a matter of law, plaintiff's allegation of breach is time-barred under K.S.A. § 60–511(1).

Third, plaintiff alleges that defendants breached the License Agreement when they failed to properly declare and calculate deductions on the invoiced sales price of the Base. Again, neither party has submitted evidence of the dates on which defendants first failed to declare any deductions in writing or when defendants first sent incorrect royalty amounts because of improper deductions. On this record, defendants have failed to establish that as a matter of law, plaintiff's breach of contract allegation is time-barred under K.S.A. § 60–511(1).

Defendants argue that plaintiff cannot avoid the statute of limitations by only seeking royalty payments, and not seeking damages for failure to assign the Food Service Base Patent. Defendants assert that plaintiff cannot have one without the other: without any ownership interest in the 882 Patent, plaintiff cannot collect royalty payments. Again, however, this argument is legally unsupported and too clever by half. Defendants' obligation to make royalty payments is not dependent on whether plaintiff has an ownership interest in the 882 Patent. The critical question is whether the 882 Patent is an "application of the technology" contained in the TSI Base

Patents, which plaintiff licensed to defendants.  If so, defendants must make royalty payments based on the licensed technology and it does not matter whether plaintiff has an ownership interest in the 882 Patent.

Viewing the evidence in the light most favorable to plaintiff, the Court overrules defendants' motion for summary judgment based on the statute of limitations.

> 2. Whether Plaintiff Waived Its Right To Assert That The 882 Patent Is An "Application Of The Technology"

Defendants argue that the Court should grant summary judgment on plaintiff's breach of contract claim because plaintiff waived its right to argue that the 882 Patent is an "application of the technology" contained in the TSI Base Patents.

Waiver is the intentional relinquishment of a known right.  Postal Savings & Loan Ass'n v. Freel, 10 Kan. App. 2d 286, 287, 698 P.2d 382, 384 (1984).  To establish waiver, "there must be evidence that manifests, in an unequivocal manner, an intent that is inconsistent with the intent to claim a right."  Razorback Contractors of Kan., Inc. v. Bd. of Cnty. Comm'rs of Johnson Cnty., 43 Kan. App. 2d 527, 545, 227 P.3d 29, 41 (2010).  Waiver requires both knowledge and intent, and courts may infer intent by the party's conduct.  Sultani v. Bungard, 35 Kan. App. 2d 495, 498, 131 P.3d 1264, 1267 (2006).  Once a party establishes that waiver occurred, the party that relinquished the contractual right cannot assert it.  United Am. State Bank & Tr. Co. v. Wild W. Chrysler Plymouth, Inc., 221 Kan. 523, 526–27, 561 P.2d 792, 795 (1977).

Generally, whether a party waived its contractual right presents a question of fact that the Court can only decide on summary judgment when the facts and circumstances relating to the waiver are admitted or clearly established.  Sperry v. McKune, 305 Kan. 469, 491, 384 P.3d 1003, 1017 (2016); Kan. Wheat Growers Ass'n v. Windhorst, 131 Kan. 423, 430, 292 P. 777, 781 (1930).

Defendants argue that plaintiff's breach of contract claim fails because plaintiff waived its rights to receive royalty payments based on the theory that the 882 Patent is an "application of the technology." Specifically, defendants assert that (1) plaintiff first contacted Dinex about the "patent pending" marking in December of 2007; (2) two days later, Dinex informed plaintiff that plaintiff did not jointly own the patent rights, but that it would provide a copy of the application once finalized; and (3) plaintiff made no further objection and signed the Addendum in January of 2008, despite never reviewing the application. Defendants contend that because plaintiff (1) did not take further action to inquire about the pending patent and (2) signed the Addendum without inquiring further about the ownership rights for the new Base design, plaintiff waived the right to assert that the 882 Patent is an application of the technology contained in the TSI Base Patents.

Plaintiff responds that the parties expressly and jointly agreed to defer the issue. Specifically, plaintiff cites the email that Hensley sent to Runyan stating that plaintiff was "content to wait and defer addressing this issue until after we have something to evaluate. In the meantime, we'll reserve our right to address this issue until after we get the promised information." Email From Hensley To Runyan (Doc. #74-4) at 1. Further, plaintiff highlights that at that time (December of 2007), Dinex had not yet finalized or filed any patent application for it to assert that the 882 Patent was an application of the technology. Plaintiff also argues that it believed that the License Agreement would automatically make it a joint owner of any patent, so it did not need to take further action to assert its rights to ownership in the new design. For waiver to occur, the party must intentionally relinquish a known right. Essentially, plaintiff argues that at the time of the alleged waiver, it had no known right to waive. Plaintiff it told Dinex it was "content to wait" until Dinex sent the requested information and "reserve[d] [its] right to address this issue." Id.

Defendants argue that plaintiff cannot reserve its right to address the issue in perpetuity

and the reservation only lasts a reasonable time to conduct a necessary investigation.  Although the Court agrees that a reservation of rights cannot continue in perpetuity, the question whether plaintiff reserved its right for a reasonable time is a question of fact for the jury.  Plaintiff reserved its right to address the issue until defendants sent the finalized application.  Defendants never sent the application and cannot foist waiver on plaintiff by its own inaction.

Viewing the evidence in the light most favorable to plaintiff, plaintiff has demonstrated a genuine issue of material fact whether it waived its right to assert that the 882 Patent is an application of the technology contained in the TSI Base Patents.  The Court therefore overrules defendants' motion for summary judgment on this ground.

3. Whether The 882 Patent Constitutes An "Application Of The Technology" In Plaintiff's Patents, So As To Trigger An Obligation To Make Royalty Payments On Sales Of The Base

Defendants argue that the 882 Patent does not constitute an "application of the technology" contained in the TSI Patents and therefore their obligations under the License Agreement did not require them to make royalty payments on sales of the Base.  Plaintiff argues that the 882 Patent is an "application of the technology" contained in its patents and that defendants breached the License Agreement by failing to complete royalty payments on sales of the Base until 2028.

Preliminarily, the Court notes that (1) this is not a patent infringement case; (2) neither side argues that the phrase "application of the technology" is a term of art; (3) neither side contends that the phrase is ambiguous; and (4) both sides have nevertheless hired experts who profess to having special insight on what the phrase means and how the Court should interpret it.

To analyze whether the 882 Patent is an "application of the technology," the Court must first interpret the meaning of the phrase.   Under Kansas law, the cardinal rule of contract interpretation is that the Court must ascertain and give effect to the parties' intent.  <u>Waste</u>

Connections of Kan., Inc. v. Ritchie Corp., 296 Kan. 943, 963, 298 P.3d 250, 264 (2013). Where a contract is unambiguous, "the Court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parole evidence." Fisherman Surgical Instruments, LLC v. Tri-anim Health Servs., Inc., 502 F. Supp. 2d 1170, 1179 (D. Kan. 2007). Where a contract is ambiguous, however, "the intention of the parties is not ascertained by resort to the literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances" which aid in determining the intention of the parties. Reed v. Phillip Roy Fin. Servs., LLC, No. 05-2153-JAR, 2007 WL 4233617, at *3 (D. Kan. Nov. 27, 2007) (citations omitted). Accordingly, if terms or provisions within an agreement are ambiguous, "parol evidence is permitted to explain their meaning." Id. (citations omitted).

Whether an instrument is ambiguous is a question of law for the Court. Simon v. Nat'l Farmers Org., 250 Kan. 676, 679–80, 829 P.2d 884, 887–88 (1992). A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." Id. Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." Marquis v. State Farm Fire & Cas. Co., 265 Kan. 317, 324, 961 P.2d 1213, 1219 (1998). A contract is not ambiguous merely because it does not address an issue, or because the parties dispute the meaning of a term. TMG Life Ins. Co. v. Ashner, 21 Kan. App. 2d 234, 242, 898 P.2d 1145, 1154 (1995); Ryco Packaging Corp. v. Chapelle Int'l, Ltd., 23 Kan. App. 2d 30, 36, 926 P.2d 669, 674 (1996).

Here, the License Agreement does not define the phrase "application of the technology." As with many contract disputes, the parties advance differing interpretations of the phrase. Even

so, as noted, neither party claims that "application of the technology" is ambiguous.  Defendants assert that the only reasonable way to determine whether the 882 Patent is an "application of the technology" represented by plaintiff's patents is to compare the claims of plaintiff's patents to those of the 882 Patent.  Defendants submit pages of exhibits which analyze the claims line by line, demonstrating that the 882 Patent does not contain identical claims.  Plaintiff responds that reviewing the patents for identical language is the incorrect standard, because the USPTO never would have issued the 882 Patent if it were identical to plaintiff's patents.  Plaintiff proposes that the phrase "application of the technology" merely means that defendants "incorporated" plaintiff's patented technology into the 882 Patent.  Neither party argues that "application of the technology" equates to "infringement" as defined by federal patent law.[12]

Because neither side argues that the License Agreement is ambiguous, the Court will not invent arguments to that effect or address the issue of how any ambiguity might be resolved.  On this record, it is sufficient to say that defendants' view of the matter is not the only reasonable way to determine whether the 882 Patent is an "application of the technology" represented by plaintiff's patents.  Not by a long shot.  If the parties had intended that this phrase be defined by a line-by-line comparison of new versus existing patent claims, they presumably would have said as much.

Paragraph 6 of the License Agreement states that "[e]ither party may file for a patent on the *application of the technology represented by the Patents* solely to the Food Service Base."

---

[12]    Infringement occurs under federal patent law either literally or under the doctrine of equivalents.  Literal infringement exists when a patent exactly embodies every element or limitation of the claim of another patent.  <u>Overhead Door Corp. v. Chamberlain Group, Inc.</u>, 194 F.3d 1261, 1269 (Fed. Cir. 1999).  Even if there is no literal infringement, infringement still exist under the doctrine of equivalents "if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  <u>Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17, 21 (1997).  Neither party asserts that these tests apply here.

License Agreement (Doc. #17-1), ¶ 6 (emphasis added).  This is the only time "application of the technology" is used in the License Agreement.  As noted, the agreement does not define the phrase.  Therefore, the Court looks to the common-sense everyday meaning of the words to demonstrate the intent of the parties at the time of contracting.  Harmon v. Safeco Ins. Co. of Am., 24 Kan. App. 2d 810, 812, 954 P.2d 7, 9 (1998) (undefined contract term given natural and ordinary meaning to ordinary mind).  To "apply" means "to put to use with a particular subject matter."  Black's Law Dictionary (7th ed. 1999) (edition in effect at time parties executed License Agreement).  "Technology" is defined as "equipment, machines, and methods based on contemporary knowledge of science and computers."  Black's Law Dictionary (10th ed. 2014) ("technology" first defined in tenth edition).

Here, as noted, defendants rely on a line-by-line comparison of the "claims" of the licensed TSI Patents and the "claims" of the 882 Patent.  Their own analysis reveals (and they admit) that the 882 Patent includes among its independent claim a "heat retentive disc" which overlaps with the claims in plaintiff's three patents.  Also, claim 5 of the 882 Patent includes an RFID tag sealed in a well in the lower surface of a bottom wall of the Charger base.  While that claim may not precisely map on the claims in plaintiff's patents, the Court cannot determine as a matter of law that claim 5 does not put plaintiff's patented technology to use or lay its own claims over those of plaintiff.

The Court therefore overrules defendants' motion for summary judgment on this issue.  Giving the words of the License Agreement a reasonable construction, a genuine issue of material fact exists whether the 882 Patent is an "application of the technology" contained in plaintiff's licensed patents.

4.     Whether Dinex Independently Developed The 882 Patent

Defendants argue that even if the 882 Patent was an application of the technology contained in the TSI Base Patents, they are entitled to summary judgment on plaintiff's breach of contract claim because the License Agreement excludes royalties for technology which Dinex independently developed and Dinex independently developed the technology at issue in the 882 Patent.

Defendants again point to Paragraph 6 of the License Agreement, which states as follows:

6.     <u>Patents on the Food Service Base</u>. Either party may file for a patent on the application of the technology represented by the Patents solely to the Food Service Base ("Food Service Base Patent").  Both parties shall be joint owners of such Food Service Base Patent and shall owe no royalty to the other in addition to those designated in this Agreement.  [Dinex] specifically agrees that this paragraph and the Food Service Base Patents do not grant [Dinex] any rights under the [TSI Base Patents] other than those rights assigned in conjunction with Food Service Bases elsewhere in this Agreement.  *[Plaintiff] agrees that this paragraph does not grant [plaintiff] any rights under technology currently owned by [Dinex] or independently developed by [Dinex] in the future, and [Dinex] shall have no royalty obligation to [plaintiff] with respect to pre-existing technology owned by [Dinex] and/or technology independently developed by [Dinex] in the future, provided such technology does not infringe upon the valid claims of [the TSI Base Patents].*

<u>License Agreement</u> (Doc. #17-1), ¶ 6 (emphasis added).  Defendants assert that they independently developed the Base with their vendor, Seitz.  In support of this assertion, defendants point to the deposition of plaintiff's co-founder, Ryan Clothier.  Clothier testified that he played multiple roles in the development of the 882 Patent, including teaching Dinex how to use RFID in a food service base, where to place the RFID tag and how to position the tag.  <u>Deposition Of Ryan Clothier</u> (Doc. #74-3) at 31.  Defendants largely emphasize the next portion of Clothier's testimony in which he states that he contributed to the development of the *prior* base but notes that the new Base uses the

same technology.[13]   Id. (emphasis added).   From this testimony, defendants argue that plaintiff only contributed to the development of the prior Base, not the re-designed Base which is the subject of the 882 Patent.

The deposition testimony which defendants highlight, however, is counterintuitive to their position that they developed the 882 Patent "without any input from TSI."   Defendants' Motion For Summary Judgment (Doc. #74) at 35.   Again, the phrase "independently developed" is not defined in the License Agreement and neither party asserts that the phrase is ambiguous.   Thus, using the common-sense everyday meaning of these words, a reasonable jury could conclude— based on Clothier's involvement in designing the original Base and associated parts—that

---

[13]      Plaintiff also points to Clothier's affidavit in which he states, "I knew that Dinex was doing the redesign because I was involved in it."   Affidavit Of Brian Clothier (Doc. #80-1) filed July 1, 2024, ¶ 13.   Defendants argue that the Court cannot consider the affidavit of Clothier because it is a "sham affidavit" which contradicts Clothier's deposition testimony that he only contributed to the initial Base design.

The Court will disregard affidavits which are inconsistent with prior sworn testimony if the changes attempt to create a sham issue of fact to defeat summary judgment.   See Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).   To determine if an affidavit is an attempt to create a sham issue of fact, the Court must consider "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."   Id.

Clothier's affidavit contradicts his prior deposition testimony that he only contributed to the prior Base development, but that the new Base uses the same technology.   The Court thus considers the four Franks factors.   See id.   Clothier was cross-examined during his deposition, he does not claim that he did not have access to pertinent evidence or that his affidavit is based on newly discovered evidence.   In addition, Clothier does not claim that his affidavit is to address any confusion that he experienced during his deposition.   The Court therefore disregards the portions of Clothier's affidavit that contradict his earlier testimony.   Specifically, the Court disregards his declaration that "[he] knew that Dinex was doing the redesign because [he] was involved in it."   Affidavit Of Brian Clothier (Doc. #80-1), ¶ 13.

defendants did not independently develop the 882 Patent.[14]   Defendants have presented no evidence that the parts Clothier developed were not included in the final new Base design.  Thus, on this record, Clothier's deposition testimony is sufficient to demonstrate a genuine issue of material fact whether defendants independently developed the 882 Patent and therefore owe no royalties on sales of the Base.  The Court therefore overrules defendants' motion for summary judgment on this issue.

5.      Whether Defendants Breached The Royalty Provisions

Finally, defendants argue that they are entitled to summary judgment on plaintiff's remaining breach of contract allegations: that they failed to (1) provide a statement from their independent accounting firm certifying the accuracy of the royalty payments; (2) declare in writing any deductions to the invoiced sales price; and (3) properly calculate the royalty amount owed on the invoiced sales price of the Bases.

Defendants direct the Court to Paragraph 4(d) of the License Agreement and Paragraph 8 of the Addendum, which state as follows:

> (d)      Royalty. [Dinex] shall pay [plaintiff] a royalty at the Royalty Percentage as set under the calculation method set forth herein, of the amount of the "net sales" of the Food Service Bases sold by [Dinex]. As used herein, the term "net sales" shall mean the total of all charges invoiced to customers for the Food Service Base reduced by such deduction as declared in writing by Licensee (which may include commissions and rebates).

> 8.      Books and Records. [Dinex] agrees to provide [plaintiff], within 90 days of the end of each of its fiscal years ending after June 1, 2008, a statement from its regular independent accounting firm certifying as to (1) the accuracy of the royalty payments being made to [plaintiff] under the Agreement or (2) the amount [Dinex's] auditor determines [Dinex] has underpaid.

---

[14]      "Independent" is defined as "[n]ot subject to the control or influence of another," "[n]ot associated with another" or "[n]ot dependent or contingent on something else."  Black's Law Dictionary (7th ed. 1999).  To "develop" is to "change," "improve" or "alter" something.  Id. (defining "development").

License Agreement (Doc. #17-1), ¶ 4(d); Addendum (Doc. #17-4), ¶ 8.

Defendants assert that (1) the License Agreement requires payment on invoiced prices; (2) in calculating the amount of royalties owed, they deducted the dollar amount of returns from invoiced sales; (3) when a returned product was subsequently re-sold, they paid the royalty based on that invoiced sale; (4) they created and sent invoices to plaintiff which reflected the negative amounts credited to customers for the returns; and (5) plaintiff waived its right to request the accounting certification statements.

### a. Certification Statements

Defendants argue that plaintiff only requested certification statements three times (once in 2009 and twice in 2011) and made no further request for the 11 years before filing suit, so it waived its right to accounting statements. Plaintiff responds that it could not have waived its right because the License Agreement does not require it to actually request certification statements and even so, waiver is generally a question of fact for the jury to decide.

The Addendum states, "[Dinex] agrees to provide [plaintiff]. . . a statement from its regular independent accounting firm certifying as to (1) the accuracy of the royalty payments being made to [plaintiff] under the Agreement." Addendum (Doc. #17-4), ¶ 8. This provision is clear: even without a request from plaintiff, defendants had an obligation to provide the certification statements to plaintiff at the end of each fiscal year.[15]

---

[15] Defendants may be confusing this paragraph with Paragraph 4(d) of the License Agreement and Paragraph 2(a) of the Addendum, which require defendants to "retain all records relating to the royalty and its calculation for three years to enable [plaintiff] to review such records, if requested by [plaintiff]." License Agreement (Doc. #17-1), ¶ 4(d); Addendum (Doc. #17-4), ¶ 2(a). While plaintiff did have to take affirmative action to request defendants' records, it did not have to do so to obtain the annual accounting statements certifying the accuracy of the royalty payments.

Defendant now argues that plaintiff's inaction constitutes waiver. The License Agreement imposed no duty, however, for plaintiff to request certification statements. The Court overrules defendants' motion for summary judgment on this ground because defendants have failed to show that as a matter of law their actions did not breach the License Agreement.

b.      Declaring Deductions

Plaintiff argues that defendants breached the License Agreement because they did not declare deductions in writing on net sales to plaintiff as required by Paragraph 4(d) of the License Agreement. Defendants submit that they did declare deductions in writing because they created and sent invoices to plaintiff which reflected the negative amounts credited to customers for the returns.

In response, plaintiff cites the declaration of William Hensley, its chief executive officer. Hensley states that (1) plaintiff never received any invoices or sales credit memoranda from defendants; (2) quarterly statements from defendants never indicated amounts of sales returns; and (3) when plaintiff did receive payment evidence from defendants, it was in the form of a check or an ACH payment notification, which only noted the total payment amount. Affidavit Of William Hensley (Doc. #80-2), ¶ 8. Plaintiff attaches to its brief an example of a check received from defendants and an ACH payment email notification. Viewing the evidence in the light most favorable to plaintiff, plaintiff has demonstrated a genuine issue of material fact whether defendants declared deductions in writing as required by the License Agreement.

c.      Calculating Royalty Payments

Plaintiff contends that defendants breached the License Agreement because they made deductions to their royalty payments for returns from invoiced sales prices. Plaintiff asserts that because deductions for returns constitute "discount[s]" in violation of the License Agreement,

defendants breached the License Agreement and have been underpaying royalties.

Defendants assert that the License Agreement permits them to deduct for returns and that even if it did not, federal law prohibits plaintiff from receiving double royalties on sales of returned Bases and Chargers. Defendants invoke the doctrine of patent exhaustion and the affirmative defense of patent misuse. Initially, the Court notes that defendants have admitted to deducting returns. See Declaration Of Jay Froehlich (Doc. #74-10), ¶ 2 ("When CFS calculated and paid royalties . . . it did so by taking the total dollar amount of its invoiced sales of the [Bases and Chargers] for a quarter, deducting the dollar amount of returns of the [Bases and Chargers]."); see also Defendants' Motion For Summary (Doc. #74) at 37 (providing invoice example deducting returns). Given this evidence, and the fact that defendants have provided no evidence that plaintiff is indeed receiving double royalties, their concerns that plaintiff would receive double royalties is purely hypothetical. The Court first determines whether multiple royalties on one product violates federal law, then turns to whether defendants' method of calculating the effect of returns on their royalty payments breaches the License Agreement.

"The doctrine of patent exhaustion limits a patentee's right to control what others can do with an article embodying or containing an invention." Bowman v. Monsanto Co., 569 U.S. 278, 283 (2013). In other words, the doctrine of patent exhaustion would prohibit defendants from selling the Base and then "invoking patent law to control postsale use of the article." Quanta Computer, Inc. v. LG Elecs., Inc., 553 U.S. 617, 638 (2008). The doctrine does not, however, prohibit multiple royalties on a single patented product. ExcelStor Tech., Inc. v. Papst Licensing GMBH & Co. KG, 541 F.3d 1373, 1377 (Fed. Cir. 2008). Collection of two sets of royalties may constitute breach of contract or fraud under state law, but it does not violate federal patent law to do so. Id. Accordingly, on the issue of whether plaintiff's collection of double royalties violates

the doctrine of patent exhaustion, defendants are not entitled to summary judgment as a matter of law.

Defendants also assert the affirmative defense of patent misuse to argue that plaintiff cannot collect two royalties on sales of returned Bases and therefore they did not breach the License Agreement in deducting returns from the invoiced sales price. To establish patent misuse for the collection of multiple royalties on one product, defendants must show that (1) plaintiff collected royalties on the 882 Patent from two licensees, (2) royalties collected from two licensees related to the same product (the Base), (3) plaintiff's "collection of double royalties impermissibly extends either the physical or temporal scope of the [882 Patent] with anticompetitive effect" and (4) plaintiff's collection of royalties from two licensees imposes an "unreasonable restraint on competition." PSC Inc. v. Symbol Techs., Inc., 26 F. Supp. 2d 505, 509 (W.D.N.Y. 1998). Because defendants have not established any of the above elements—specifically, defendants have not proven the existence of a second licensee's royalty payments on sales of the Base—this defense does not apply.

Defendants have not shown that plaintiff's hypothetical collection of multiple royalties on the sale of a returned Base or Charger violates federal law. As to the License Agreement, defendants argue that as a matter of law, they did not breach by deducting returns from invoiced sales prices.

The License Agreement and Addendum are silent on the issue of returns, both whether defendants can deduct returns and whether plaintiff can collect royalties on returns. The Addendum states that defendants shall not reduce the invoiced sales price by any "rebates, allowances, commissions or subsequent discounts." Addendum (Doc. #17-4) at 1. Under Kansas law, the cardinal rule of contract interpretation is that the Court must ascertain and give effect to

the parties' intent.  <u>Waste Connections</u>, 296 Kan. at 963, 298 P.3d at 264.  Where a contract is unambiguous, the Court must determine the parties' intent from the four corners of the document.  <u>Id.</u>  Terms within an unambiguous contract are to be given their "plain, ordinary and popular meanings."  <u>Crescent Oil Co. v. Federated Mut. Ins. Co.</u>, 20 Kan. App. 2d 428, 431, 888 P.2d 869, 872 (1995).

The term "discount" is not ambiguous.  "[D]iscount" means "[a] reduction from the full amount or value of something, [especially] a price."  <u>Black's Law Dictionary</u> (8th ed. 2004) (edition in effect at time parties executed Addendum).  A deduction from the invoiced sales price for returns constitutes a "reduction from the full amount," and thus is a discount as understood in the License Agreement.

The Addendum clearly states that defendants must calculate their royalty payments by determining 4.09 per cent of the net sales price: the invoiced sales price at which defendants sells the Base or Charger, not reduced by any "rebates, allowances, commissions or subsequent discounts."  <u>Addendum</u> (Doc. #17-4) at 1.  Because the License Agreement does not allow further reductions of the invoiced sales price and is silent on whether defendants can deduct returns, defendants have not established as a matter of law that their actions did not constitute breach.  The Court therefore overrules defendants' motion for summary judgment on this ground.

In sum, the record reveals various issues of material fact related to plaintiff's breach of contract claim.  Defendants have not established that as a matter of law, they are entitled to summary judgment on plaintiff's breach of contract claim.  Accordingly, the Court overrules defendants' motion for summary judgment on that claim.

B.    <u>Accounting</u>

In addition to asserting a claim for breach of contract, plaintiff requests that the Court order

-33-

an accounting for the last five years. Specifically, plaintiff asserts that the License Agreement required defendants to provide statements from their independent accounting firm which certified the accuracy of their royalty payments. Defendants admittedly failed to provide such statements, and plaintiff argues that an accounting is essential to determine whether (and to what extent) defendants have underpaid royalties. The Court reads plaintiff's request for an accounting not as a separate cause of action but simply as a method to calculate damages sustained on the underlying breach of contract claim. See Jordan v. Unified Gov't of Wyandotte Cnty., 100 F. Supp. 3d 1111, 1120 (D. Kan. 2015).

An accounting is proper only when "no adequate remedy at law" exists. Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962). An equitable accounting is warranted when "the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." Id. Indeed, it is a "rare care" when computational complexities render a legal remedy inadequate. Haynes Trane Service Agency, Inc. v. American Standard, Inc., 573, F.3d 947, 965 (10th Cir. 2009).

Plaintiff claims that because defendants have admitted that they owe plaintiff $143,148.02,[16] an accounting is essential to determine whether other intentional or mistaken computations exist, especially considering the fact that defendants have not provided any certification statements. Plaintiff has presented no evidence that the parties' dealings are so complicated that only a court of equity can satisfactorily unravel them or that it will be unable to

---

[16]    In response to defendants' motion for summary judgment, plaintiff submits defendants' third supplemental disclosures, which defendants sent to plaintiff on April 28, 2024. In this set of disclosures, defendants admit that during discovery, they found that for almost three years, they did not pay royalties to plaintiff on one version of the Charger. From this non-payment, defendants state that they owe plaintiff $143,148.02. Defendants make no mention of this fact in their motion for summary judgment.

determine damages through traditional avenues of discovery.  In fact, defendants' supplemental disclosure, which revealed one amount owed, suggests that the parties can calculate any amount owed based on invoice sales records, the royalty percentage and interest calculations.

Construing plaintiff's request for an accounting as a method to determine damages for defendants' alleged breach, and not as a separate cause of action, defendants have not shown that they are entitled to judgment as a matter of law.  The Court therefore overrules defendants' motion for summary judgment on this issue.

## II.      Defendants' Claims

Defendants seek summary judgment on their three counterclaims: conversion, money had and received and unjust enrichment.  Defendants contend that they mistakenly overpaid royalties to plaintiff on sales of the Chargers and plaintiff refused to return the funds, which are defendants' property.  Accordingly, defendants bring claims of conversion, money had and received and unjust enrichment against plaintiff.

"A conversion is an unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."  Bomhoff v. Nelnet Loan Services, Inc., 279 Kan. 415, 421, 109 P.3d 1241, 1246 (2005).  To prevail on their conversion claim, defendants must show that plaintiff: (1) assumed or exercised the right of ownership (2) over defendants' property (3) without authorization and (4) to the exclusion of defendants' rights.  Lucas v. S. Meridian Park, LLC, 2013 WL 646491, 294 P.3d 362, at *7 (Kan. Ct. App. 2013).

In an action for money had and received, "the question . . . is to which party does the money, in equity, justice and law, belong."  Coppock v. J.C. Nichols Inv. Co., 146 Kan. 372, 372, 69 P.2d 701, 702 (1937).  To establish a claim for money had and received, defendants must show

that plaintiff "holds money which, in equity and good conscience, belongs to [them]".  Id.  An action for money had and received "is the proper form of action for the recovery of money paid under a mistake of facts."  Blair v. Haas, 127 Kan. 323, 323, 273 P. 400, 401 (1929).

To establish a claim of unjust enrichment under Kansas law, defendants must establish "(1) a benefit conferred upon one person by another; (2) an appreciation or knowledge of the benefit received; and (3) the acceptance or retention of the benefit by the individual receiving the benefit under such circumstances as to make it inequitable for the individual to retain the benefit without payment of its value."  Security Benefit Life Ins. Corp. v. Fleming Cos., Inc., 21 Kan. App. 2d 833, 908 P.2d 1315, Syl. ¶ 5 (1995).

In these claims, defendants argue that plaintiff is in possession of funds belonging to them because defendants overpaid royalties on sales of the Charger.  Specifically, defendants assert that (1) the last TSI Charger Patent (the 169 Patent) expired on September 6, 2020; (2) defendants continued making royalty payments to plaintiff until April 8, 2022; (3) these overpayments totaled $149,228.38; and (4) defendants requested that plaintiff return these funds and plaintiff refused.

Plaintiff argues that defendants did not overpay royalties because the last TSI Charger Patent (the 170 Patent) expired on May 31, 2022.  In support of this contention, plaintiff points to the express language of the Addendum, which listed three specific charger patents: (1) the 585 Patent; (2) the 169 Patent; and (3) the 170 Patent.[17]  Addendum (Doc. #17-4), ¶ 4.  In addition, plaintiff submits an email from Solenne Boeglin, defendants' Senior Sourcing Manager, which states, "The patent of the chargers expired by May 2022."  Solenne Boeglin Email (Doc. #80-10) at 1.  In reply, defendants insist that the parties only included the 170 Patent in the Addendum for

---

[17]     Again, the parties agree that the Addendum includes a typographical error and should refer to U.S. Patent No. 6,657,170 (the 170 Patent) rather than U.S. Patent 6,657,150.

"nothing more than for ease of reference," the 170 Patent contains no claims covering the Chargers and "[s]imply put, Ms. Boeglin was wrong."  <u>Defendants' Reply In Support Of Their Motion For Summary Judgment</u> (Doc. #82) filed July 15, 2024 at 14.

Plaintiff has demonstrated a genuine issue of material fact whether defendants owed royalties on sales of the Charger under the 170 Patent until its expiration on May 31, 2022. Because defendants have not established as a matter of law that plaintiff possesses funds belonging to them, the Court overrules defendants' motion for summary judgment on their counterclaims.

## III.     Defendants' Motion To Exclude Clothier's Expert Testimony

On January 15, 2024, plaintiff designated Ryan Clothier as an expert in this case.  <u>See Plaintiff's Expert Disclosures</u> (Doc. #53).  On June 7, 2023, defendants filed a motion to exclude his expert testimony because (1) plaintiff's disclosure failed to comply with Rule 26(a)(2), Fed. R. Civ. P., and (2) Clothier is not qualified to provide expert testimony on patent prosecution.  <u>See Defendants' Motion To Exclude</u> (Doc. #73).

Rule 702, Fed. R. Evid., provides that an expert may testify to scientific, technical or other specialized knowledge if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case.  Under Rule 702, the Court has a gate-keeping obligation to determine the admissibility of all expert testimony.  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999) (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993)).  Expert testimony is admissible only if it is both relevant and reliable.  <u>Id.</u>  The touchstone of the Court's inquiry is whether the testimony helps the factfinder understand evidence or determine a fact in issue.  <u>BioCore, Inc. v. Khosrowshahi</u>, 183 F.R.D. 695, 699 (D. Kan. 1998).  Courts have broad discretion in deciding whether to admit expert testimony but should resolve doubts in favor of

admissibility. <u>Id.</u>; <u>Kieffer v. Weston Land, Inc.</u>, 90 F.3d 1496, 1499 (10th Cir.1996); <u>see</u> Fed. R. Evid. 702 advisory committee's note; <u>Daubert</u>, 509 U.S. at 588–89.

For substantially the reasons stated in plaintiff's <u>Response To Defendants' Motion To Exclude The Expert Opinions And Testimony Of Brian Clothier</u> (Doc. #79) filed July 1, 2024, the Court overrules defendants' motion to exclude Clothier's expert testimony.  The Court therefore overrules as moot defendants' <u>Request For Hearing</u> (Doc. #83) filed July 30, 2024.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion For Summary Judgment And Memorandum In Support</u> (Doc. #74) filed June 7, 2024 is **OVERRULED.  The Court directs the Clerk to unseal the following provisionally sealed exhibits filed in support of defendants' motion for summary judgment: Docs. #74-4, 74-5, 74-7, 74-8, 74-11, 74-12, 74-13, 74-20, 74-23, 74-24 and 74-25.**

**IT IS FURTHER ORDERED** that <u>Defendants' Motion To Exclude The Expert Opinions And Testimony Of Brian Clothier</u> (Doc. #73) filed June 7, 2024 is **OVERRULED.**

**IT IS FUTHER ORDERED** that defendants' <u>Request For Hearing</u> (Doc. #83) filed July 30, 2024 is **OVERRULED as moot**.

Dated this 22nd day of August, 2024 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge